IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ERIC KOENIG and<br>PAULA KOENIG,<br><br>Plaintiffs,<br><br>vs.<br><br>THE PURDUE PHARMA COMPANY,<br>PURDUE PHARMA, L.P., PURDUE<br>PHARMA INC., PURDUE<br>FREDERICK COMPANY, THE P.F.<br>LABORATORIES, INC., THE ABBOTT<br>LABORATORIES, ABBOTT<br>LABORATORIES, INC., and<br>MALLINCKRODT, INC.,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 3:04-CV-01590-K |

## ABBOTT DEFENDANTS' BRIEF IN SUPPORT
## OF ITS MOTION FOR SUMMARY JUDGMENT

## **Table of Contents**

I.     Summary ........................................................................................................... 1

II.    Introduction and Overview ............................................................................ 1

   A.  Plaintiffs' Claims and Theories Against Abbott ...................................... 2

   B.  Allegations Regarding Plaintiff Eric Koenig's Prescription Use of
       OxyContin ................................................................................................ 3

III.   Statement of Material Facts ............................................................................ 3

   A.  Facts as to Abbott ................................................................................... 3

   B.  Facts as to Plaintiff Eric Koenig's Prescribing Physicians ...................... 5

   C.  Plaintiffs' Deposition Testimony ............................................................ 9

IV.   Standard of Review ...................................................................................... 11

V.    Argument ..................................................................................................... 12

   A.  Causation Is a Necessary Element of a Personal Injury Claim ............... 12

      1.  Strict Liability based on Defective Design/Failure to Warn ............. 13

      2.  Breach of Implied Warranty of Merchantability ............................. 13

      3.  Negligence ...................................................................................... 14

      4.  Fraud, Misrepresentation, and Suppression ................................... 14

   B.  Plaintiffs' Claims are barred by the learned intermediary doctrine ......... 15

   C.  Because Plaintiffs Cannot Show that Abbott's Actions Caused their
       Injuries, Plaintiffs' Claims Fail as a Matter of Law .............................. 16

   D.  Because Plaintiffs' Injury Claims Fail for Lack of Causation, Plaintiffs'
       Derivative  Civil Conspiracy Claim Also Fails .................................... 19

   E.  Plaintiffs' assertion that Abbott and Purdue were engaged in a joint
       venture is without factual or legal basis ................................................ 20

      1.  There was no agreement, express or implied, to form a joint venture ....... 21

      2.  Abbott did not have a mutual right of control or management ................... 22

      3.  The Co-Promotion Agreement served an explicitly limited common purpose –
          to co-promote OxyContin – and nothing more ........................................ 23

      4.  There is no sharing of profits as principals or sharing of losses, costs, or
          expenses ......................................................................................... 25

   F.  Because Plaintiffs Do Not Have Standing to Sue Abbott, Abbott Is
       Entitled to Summary Judgment as a Matter of Law ............................... 29

VI.   Conclusion ................................................................................................... 30

## TABLE OF AUTHORITIES

### CASES

*A.T. Kearney, Inc. v. IBM Corp.,*
  73 F.3d 238 (9th Cir. 1995) ................................................................................ 27

*Allen v. Purdue Pharma, L.P.,*
  No. 01-C-224(R) (Cir. Ct., Greenbrier County, W. Va. June 26, 2002) ......................... 19

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) .............................................................................. 11, 12

*Angulo v. Purdue Pharma Co.,*
  No. 04-1638-A (Oct. 24, 2005) .................................................................. 2, 17

*BA Mortgage and Int'l Realty Corp. v. American Nat'l Bank & Trust Co. of Chicago,*
  706 F. Supp. 1364 (N.D. Ill. 1989) ................................................................ 21

*Banks v. Estate of Patrick McLain, M.D.,*
  No. 02-CV-106 (R) ................................................................................ 18

*Bertulli v. Int'l Ass'n of Continental Pilots,*
  242 F.3d 290 (5th Cir. 2001) ...................................................................... 29

*Binkley v. Palmer,*
  10 S.W.3d 166 (Mo. Ct. App. 1999) ........................................................... 27, 28

*Blankenship v. P.F. Labs., Inc.,*
  No. 7-02-3445-22 (D. S.C. Nov. 21, 2003) ........................................................ 18

*Brown v. Purdue Pharma, L.P.,*
  No. 2002-0045CI (Cir. Ct., Leflore County, Miss. Mar. 22, 2004) .............................. 18

*Buzhardt v. P.F. Labs., Inc.,*
  No. 8:02-3684-22 (D. S.C. Nov. 21, 2003) ........................................................ 18

*California Dental Ass'n v. FTC,*
  526 U.S. 756 (1999) ............................................................................... 25

*Cash v. P.F. Labs., Inc.,*
  No. 7:02-3685-22 (D. S.C. Nov. 21, 2003) ........................................................ 18

*Castle Tex. Production Lim. P'ship v. Long Trusts,*
  134 S.W.3d 267 (Tex. App.—Tyler 2003) ........................................................ 21

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ............................................................................................. 11

*Coastal Plains Dev. Corp. v. Micrea, Inc.,*
   572 S.W.2d 285 (Tex. 1978)................................................................................. 21

*DuPlantis v. Shell Offshore, Inc.,*
   948 F.2d 187 (5th Cir. 1991) ............................................................................... 11

*Electronic Assocs. v. Automatic Equip. Dev. Corp.,*
   185 Conn. 31, 440 A.2d 249 (1981)..................................................................... 20

*Ewing v. Purdue Pharma, L.P.,*
   No. 2:02-CV-00150, 2003 WL. 1883475 (W.D. Va. April 10, 2003) .............................. 17

*Firestone Steel Prods. Co. v. Barauas,*
   927 S.W.2d 608 (Tex. 1996)................................................................................. 19

*Foister v. Purdue Pharma, L.P.,*
   295 F. Supp. 2d 693 (E.D. Ky. 2003)................................................................ 1, 17

*Ford v. Nylcare Health Plans of the Gulf Coast, Inc.,*
   301 F.3d 329 (5th Cir. 2002) ............................................................................... 30

*Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.,*
   960 S.W.2d 41 (Tex. 1996)................................................................................... 14

*General Motors Corp. v. Saenz,*
   873 S.W.2d 353 (Tex. 1993)................................................................................. 14

*George v. Capital South Mortgage Investments, Inc.,*
   961 P.2d 32 (Kan. 1998)....................................................................................... 25

*Gonzales v. Am. Title Co. of Houston,*
   104 S.W.3d 588 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) .......................... 19

*Gutierrez v. Yancey,*
   650 S.W.2d 169 (Tex. App.—San Antonio 1983, no writ)............................................ 21

*Hackett v. G.D. Searle & Co.,*
   246 F. Supp. 2d 591 (W.D. Tex. 2002) ................................................................ 13

*Hammond v. P.F. Labs., Inc.,*
   No. 4-02-1748-22 (D. S.C. Nov. 21, 2003) ......................................................... 18

*Harco Energy, Inc. v. The Re-Entry People, Inc.,*
      23 S.W.3d 389 (Tex. App.—Amarillo 2000, no pet.) ....................................... 14

*Huck v. P.F. Labs., Inc.,*
      No. 4-02-1747-22 (D. S.C. Nov. 21, 2003) ................................................... 18

*Hyundai Motor Co. v. Rodriguez,*
      995 S.W.2d 661 (Tex. 1999) ......................................................................... 13

*In re Norplant Contraceptive Prods. Liab. Litig.,*
      955 F. Supp. 700 (E.D. Tex. 1997), *aff'd,* 165 F.3d 374 (5th Cir. 1999) .................. 15, 16

*Juhl v. Airinton,*
      936 S.W.2d 640 (Tex. 1996) ......................................................................... 19

*Lackman v. Rousselle,*
      596 N.W.2d 15 (Neb. 1999) ......................................................................... 25

*Lee v. Purdue Pharma Co.,*
      No. 3:04-CV-1697-K (N.D. Tex. Oct. 24, 2005) ........................................... 2, 16

*Lujan v. Defenders of Wildlife,*
      504 U.S. 555 (1984) .................................................................................... 29

*Mahoney v. Sylvester,*
      1993 WL 426082 (Conn. Super. 1993) ........................................................ 20

*Malacara v. Garber,*
      353 F.3d 393 (5th Cir. 2003) ....................................................................... 12

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
      475 U.S. 574 (1986) .................................................................................... 12

*Mosley v. Excel Corp.,*
      109 F.3d 1006 (5th Cir. 1997) ...................................................................... 14

*O'Shea v. Littleton,*
      414 U.S. 488 (1974) ................................................................................ 29, 30

*Peltier Enters., Inc. v. Hilton,*
      51 S.W.3d 616 (Tex. App.—Tyler 2000, pet. denied) .................................... 14

*Piccolo v. Weimann,*
      7 Conn. App. 646, 509 A.2d 1094 (1986) .................................................... 20

*Roberts v. P.F. Labs., Inc.,*
    No. 7:02-CV-1709-22 (D. S.C. Nov. 21, 2003)...................................................... 18

*Roberts v. Purdue Pharma, L.P.,*
    No. 1:01-3110-2 (D. S.C. Dec. 4, 2003)............................................................ 18

*Rolen v. Burroughs Wellcome Co.,*
    856 S.W.2d 607 (Tex. App.—El Paso 1993, writ denied) ............................... 15

*Shea v. Brister,*
    26 F. Supp. 2d 943 (S.D. Tex. 1998)............................................................... 29

*Skotak v. Tenneco Resins, Inc.,*
    953 F.2d 909 (5th Cir. 1996) ........................................................................... 12

*Slaihem v. Sea Tow Bahamas Ltd.,*
    148 F. Supp. 2d 1343 (S.D. Fla. 2001).............................................................. 22

*Sleeping Indian Ranch, Inc. v. West Ridge Group, LLC,*
    119 P.3d 1062 (Colo. 2005)............................................................................. 25

*Stewart v. Janssen Pharm., Inc.,*
    780 S.W.2d 910 (Tex. App.—El Paso 1989, writ denied) ............................... 16

*Stone v. First Wyoming Bank, N.A.,*
    625 F.2d 332 (10th Cir. 1980) ......................................................................... 22

*Stults v. Conoco, Inc.,*
    76 F.3d 651 (5th Cir. 1996) ............................................................................. 12

*Swinehart v. Stubbeman, McRae, Sealy, Laughlin & Browder, Inc.,*
    48 S.W.3d 865 (Tex. App.—Houston [14th Dist.] 2001, pet. denied)............. 22

*Tilton v. Marshall,*
    925 S.W.2d 672 (Tex. 1996).......................................................................... 20

*US Airways Group v. British Airways PLC,*
    989 F. Supp. 482 (S.D.N.Y. 1997)............................................................. 24, 27

*Union Pump Co. v. Allbritton,*
    898 S.W.2d 773 (Tex. 1995).......................................................................... 13

*Upjohn Co. v. Freeman,*
    885 S.W.2d 538 (Tex. App.—Dallas 1994, writ denied) ............................... 14

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*,
    454 U.S. 464 (1982) ....................................................................................... 29

*Wyeth-Ayerst Labs Co. v. Medrano*,
    28 S.W.3d 87 (Tex. App.—Texarkana 2000, no pet.) ..................................................... 13

*Yurcic v. Purdue Pharma, L.P.*,
    Civil Action No. 1: CV-03-175 (M.D. Pa. March 29, 2004) .......................................... 18

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 56(c) ............................................................................................... 11

Fed. R. Civ. P. 56(e) ............................................................................................... 12

## I.      Summary

1.      Causation is an essential element of each of plaintiffs' claims, as a matter of law, and without proof of causation, plaintiffs cannot prove their claims, and the Abbott Defendants are entitled to judgment as a matter of law.

2.      Plaintiffs' claims are barred by the learned intermediary doctrine.

3.      Civil conspiracy and loss of consortium (asserted by plaintiff Paula Koenig) are derivative torts which require proof of an underlying, specific tort.  Because all of plaintiffs' underlying claims fail as a matter of law due to lack of causation, the civil conspiracy and loss of consortium claims also fail as a matter of law.

4.      Plaintiffs' assertion that Purdue and Abbott were engaged in a joint venture is without factual or legal basis.  The requirements of a joint venture cannot be shown, and this claim must be rejected.

5.      Plaintiffs can provide no facts to show that their alleged injuries can be fairly traced to any action by the Abbott Defendants.  Therefore, plaintiffs do not have standing to sue the Abbott Defendants.

6.      Abbott hereby adopts and incorporates by references Purdue's arguments in support of its Motion for Summary Judgment.

## II.      Introduction and Overview

As explained more fully below, there is no genuine issue of material fact and Abbott is entitled to judgment as a matter of law.  Plaintiffs cannot demonstrate any factual connection between themselves and Abbott; there is no nexus between any Abbott conduct and the injury plaintiffs have alleged in this case – addiction to the prescription medication OxyContin® Tablets ("OxyContin").  Absent such a nexus, plaintiffs cannot prove proximate cause – an essential element of each of their claims.  *See, e.g., Foister v.*

*Purdue Pharma, L.P.*, 295 F. Supp. 2d 693 (E.D. Ky. 2003); *Lee v. Purdue Pharma Co.*, No. 3:04-CV-1697-K (Oct. 24, 2005) (order granting summary judgment) (attached as Ex. G) (Appendix at 82); *Angulo v. Purdue Pharma Co.*, No. 04-1638-A (Oct. 24, 2005) (ruling granting summary judgment) (attached as Ex. H) (Appendix at 83-84). Plaintiffs' assertion of a "joint venture" is entirely unsupported by either facts or law, and plaintiffs cannot provide an alternative basis for their claims against Abbott. Abbott is therefore entitled to summary judgment as to all of plaintiffs' claims.

A.    **Plaintiffs' Claims and Theories Against Abbott**

Plaintiffs' lawsuit against Abbott arises out of plaintiff Eric Koenig's alleged ingestion of a prescription medication, OxyContin.[1] Plaintiffs assert that plaintiff Eric Koenig ingested OxyContin and suffered injury as a result. *See* Complaint at ¶ 49. Plaintiffs assert six claims against Abbott, for strict liability based on failure to warn (Count I), breach of implied warranty of merchantability (Count III), negligence (Count IV), fraud, misrepresentation and suppression (County VI), civil conspiracy (Count VII), and loss of consortium (Count VIII), asserted on behalf of Mrs. Koenig. Counts II and V are strict liability and negligence claims which were asserted only against Defendant Mallinckrodt.[2]

Plaintiffs began their lawsuit against Abbott with a Complaint containing few specifics about Abbott or its alleged conduct. Plaintiffs alleged that Abbott was "in the business of advertising, promoting, marketing, selling and/or distributing OxyContin," *see id.* at ¶¶ 15, 16, 27, 28, and alleged that, beginning January 1, 1996, "Abbott co-promote[d] and distribute[d] OxyContin in certain markets, mainly to hospitals and

---

[1] This action was originally filed in the United Stated District Court for the Southern District of Illinois, but was transferred to this Court on July 12, 2004, pursuant to 28 U.S.C. § 1404(a).

[2] Pursuant to this Court's Order of October 27, 2005, Mallinckrodt was dismissed from this action.

similar healthcare facilities and to anesthesiologists." *Id.* at ¶¶ 33, 35. Plaintiffs set forth numerous additional allegations which inaccurately described Abbott's role with respect to OxyContin. The Complaint did not distinguish between the Purdue and Abbott Defendants, and simply referred to them together without any differentiation.

Plaintiffs have only two potential theories for their claim against Abbott: (1) Abbott's co-promotion of OxyContin to two doctors caused them to prescribe OxyContin to plaintiff Eric Koenig, and (2) Abbott and Purdue entered into a "joint venture."

As set forth below, neither theory is supported by facts or law.

**B.      Allegations Regarding Plaintiff Eric Koenig's Prescription Use of OxyContin**

The Complaint alleges that plaintiff Eric Koenig took OxyContin, prescribed for him by his doctors, and became addicted. No details are alleged.

### III.      Statement of Material Facts

**A.      Facts as to Abbott**

1.      The facts in support of Abbott's motion for summary judgment are contained in the Affidavit of Gerald T. Eichhorn ("Abbott Affidavit") (Exhibit A) (Appendix at 1-4), the formal written Co-Promotion Agreement between Purdue and Abbott (the "Co-Promotion Agreement") (Exhibit B) (filed under seal) (Appendix at 5-57), Plaintiff Eric Koenig's Supplemental Responses to Defendant Abbott's Interrogatories (Exhibit C) (Appendix at 58-61), the November 10, 2005 deposition testimony of Dr. Craig Danshaw (Exhibit D) (Appendix at 62-72), the October 11, 2005 deposition testimony of plaintiff Eric Koenig (Exhibit E) (Appendix at 73-78), and the October 11, 2005 deposition of plaintiff Paula Koenig (Exhibit F) (Appendix at 79-81).

2.      Abbott is not and has not been at any time a manufacturer, packager, distributor, supplier or seller of OxyContin. Exhibit A at ¶ 4 (Appendix at 2).

3.     Abbott did not develop this medication, design, formulate, undertake clinical trials, or present any application for approval to the Food and Drug Administration for this medication.  *Id.* (Appendix at 2).

4.     Abbott is not and never has been the owner of the New Drug Application (NDA) for this medication.   Abbott did not prepare the label (the "package insert"), submit the label to FDA or interact with FDA with respect to this medication.   *Id.* (Appendix at 2).

5.     Abbott did not receive communications from FDA about this medication. Abbott did not decide what dosages should be offered for sale.  *Id.* (Appendix at 2).

6.     Abbott has never been part of the chain of distribution by which OxyContin leaves the manufacturer and is distributed to the pharmacies which actually dispense the medication pursuant to prescription, and Abbott has never distributed OxyContin.  *Id.*  (Appendix at 2).

7.     Abbott has never bought or sold OxyContin.  *Id.*  (Appendix at 2).

8.     Abbott's role was limited to co-promotion of OxyContin.  Abbott co-promoted OxyContin only to specific categories of physicians, by making individual "detail" or promotional visits.  *Id.* at ¶ 5, ¶¶ 8-9.  (Appendix at 2-4).

9.     Abbott's role as co-promoter was primarily to call on physicians in specific specialties.  *Id.* at ¶ 5. (Appendix at 2).

10.     The Co-Promotion Agreement defined Abbott's role as co-promoter of OxyContin with specificity.   Abbott co-promoted OxyContin only as permitted and described in this Agreement. *See id.* at ¶ 5.  (Appendix at 2).

11.     Abbott was paid a commission by Purdue.  *See* Exhibit B, Art. 3.1 (Appendix at 31).  Abbott and Purdue did not share profits, did not share losses, and did not have a mutual right to control or manage the overall sale and promotion of OxyContin.  Ex. A at ¶ 5 (Appendix at 3).

12.     The parties agreed that they were independent contractors, and not the agents, partners, or business representatives of each other.  Ex. B, Art. 7 (Appendix at 31).

13.     They specifically provided that they were not joint venturers.  *Id.* (Appendix at 31).

**B.     Facts as to Plaintiff Eric Koenig's Prescribing Physicians**

14.     The physicians who prescribed OxyContin to plaintiff Eric Koenig were Dr. Craig Danshaw, of Fort Worth, Texas, and Dr. Alex Tseng, of Bedford, Texas.  *See* Exhibit C at 2 (Appendix at 59).  Dr. Tseng prescribed OxyContin for plaintiff Eric Koenig only once, over two years after Dr. Danshaw began prescribing OxyContin for Mr. Koenig.  *See* Exhibit E (transcript of October 11, 2005 deposition of Eric Koenig) at 216-17 (Appendix at 74-75).

15.     Dr. Danshaw first prescribed OxyContin to plaintiff Eric Koenig beginning in September 1999, for one month, and then prescribed OxyContin for Mr. Koenig from May 2000 until September 2002.  *Id.* (Appendix at 59).  Abbott called upon Dr. Danshaw to promote OxyContin beginning in August 2001; prior to that date, Abbott did not call on Dr. Danshaw.  *See* Exhibit A at ¶ 8 (Appendix at 3-4).

16.     Therefore, Abbott did not call on Dr. Danshaw until nearly two years after the time that he first prescribed OxyContin for Mr. Koenig.  *Id.* (Appendix at 4).

17.     Dr. Danshaw testified that he was knowledgeable in the use and prescribing of opioids, and that he relied on this knowledge and education in prescribing opioids for any patient.

> Q.     Now, would it be fair to say or would you describe yourself as a physician who is well knowledged in the use and prescribing of opioids or one who is inexperienced in prescribing those drugs?
>
> A.     Very knowledgeable in the utilization of opioids, whether it be oral, transdermal, intrathecal.
>
> Q.     And would you please describe to the court and jury how you've developed your expertise in learning how these drugs work, what they do, any effects that they might have on the patients that they are given to?
>
> A.     Through the years of training along with educational courses, updates, any new interventional techniques, anything where we would network as pain medicine specialists as to agents to utilize, and that is all placed into the equation.
>
> * * *
>
> Q.     Do you make your decisions on what and how you prescribe any opioid based on your knowledge and training or based on what you are told or provided by the representatives of the various drug companies that come by to see you?
>
> A.     All decisions are made on my accord.  It's all my training, which is far above any representative that's going to be entering my office, unless they are my peers of pain medicine specialist.

See Exhibit D (transcript of November 10, 2005 deposition of Dr. Danshaw) at 16-17, 22-23 (Appendix at 63-64).

18.     Dr. Danshaw testified that he did not rely on any statements or communications from Abbott in deciding to prescribe OxyContin for plaintiff, and that Abbott did not influence his decision to prescribe OxyContin for Mr. Koenig.

> Q.     At the time you made the decision, sir, to prescribe OxyContin to Mr. Koenig in September of 1999, did you rely on any statements or communications from Abbott Laboratories?

A.     No.

Q.     Did Abbott Laboratories in any way influence your decision as a medical doctor taking into account all that you take into account to prescribe OxyContin to Mr. Koenig in September of 1999?

MR. BRUEGGER:  Objection to form.

Not at all.

* * *

Q.     Did you rely on any statement or any representation by an Abbott representative at any point in time in the year 1999 or 2000 when you made the decision to prescribe or continue to prescribe OxyContin to Mr. Koenig?

MR. BRUEGGER:  Objection to form.

A.     No.

Q.     Did any representative of Abbott influence your decision to prescribe OxyContin to Mr. Koenig at any point in time in 1999 and 2000?

A.     No.

* * *

Q.     Did any representation or statement by a representative of Abbott Laboratories influence or affect you in any way in terms of your decision to prescribe OxyContin in the year 2001?

MR. BRUEGGER:  Objection to form.

A.     No.

Q.     Did you rely on any statements or representations made by Abbott Laboratories in the year 2001 when you made the decision to continue Mr. Koenig on OxyContin?

A.     No.

Q.     Moving to the year 2002, sir.  To the extent that you continue to prescribe OxyContin up – to Mr. Koenig up to the time that the intrathecal pump was implanted, did any representation or statement by an Abbott Laboratories representative influence your decision to prescribe that drug in any way?

> A.      No.

MR. BRUEGGER:  Objection to form.

> Q.      In the year 2002, sir, did you rely on any statements or
>         representations by an Abbott representative in deciding whether to
>         prescribe OxyContin to Mr. Koenig in the year 2002?
>
>> A.      No.
>
> Q.      At any point in time in your care of Mr. Koenig, sir, has Abbott
>         Laboratories made any statement or any representation or provided
>         you with either oral or written statements upon which you relied in
>         making the decision how to treat Mr. Koenig or whether to
>         prescribe OxyContin to Mr. Koenig?

MR. BRUEGGER:  Objection; form.

> A.      No.

*Id.* at 64-68 (Appendix at 67-71).

19.     Dr. Danshaw further testified that he did not remember any representatives from Abbott calling on him with respect to OxyContin:

> Q.      I just wanted to know, do you have any memory of representatives
>         of Abbott Laboratories calling on you at your office?
>
> A.      No.
>
> Q.      Do you have any memory of any discussion, meeting,
>         conversation, exchange of ideas with an Abbott representative that
>         in any way influenced or affected your decision to prescribe
>         OxyContin to Mr. Koenig?

MR. BRUEGGER:  Objection to form.

> A.      No.

*Id.* at 70 (Appendix at 72).

20.     Dr. Tseng prescribed OxyContin for plaintiff Eric Koenig on only one occasion, in June 2002.  *See* Exhibit C at 2 (Appendix at 59).  Abbott called upon Dr. Tseng to promote OxyContin beginning in February 2002; prior to that date, Abbott did

not call on Dr. Tseng. *See* Exhibit A at ¶ 9 (Appendix at 4). Mr. Koenig testified that he only took one pill from Dr. Tseng's prescription. *See* Exhibit E (transcript of October 11, 2005 deposition of Eric Koenig) at 216-17 (Appendix at 74-75). There is no evidence that Dr. Tseng prescribed OxyContin for any reason other than to maintain the treatment regimen of Mr. Koenig's primary prescribing physician, Dr. Danshaw, whose prescriptions both preceded and followed the one isolated prescription written by Dr. Tseng.

**C.    Plaintiffs' Deposition Testimony**

21.    At his deposition, plaintiff Eric Koenig testified that he did not have any knowledge about any conduct on the part of Abbott:

> Q.    You've never spoken with anyone who you knew to be an Abbott employee, have you?
>
> A.    No, sir.
>
>    \* \* \*
>
> Q.    So you've never had any contact with Abbott whatsoever related to OxyContin?
>
> A.    No, sir.
>
> Q.    And you don't know what Abbott's role was with respect to OxyContin?
>
> A.    No, sir.
>
> Q.    You have no personal knowledge of Abbott sales activities?
>
> A.    No, sir.
>
> Q.    You can't name any Abbott sales reps?
>
> A.    No, sir.
>
> Q.    You have no personal knowledge of anything that Abbott employees may have told your medical treatment providers?

A.   No, sir.

Q.   So you have no personal knowledge of any representations regarding OxyContin?

A.   Say that again.

Q.   You have no personal knowledge of any representations regarding OxyContin that you know came from Abbott?

A.   What do you mean representations?

Q.   You have no knowledge of any representations made by Abbott regarding OxyContin?

A.   No.

*See* Exhibit E (transcript of October 11, 2005 deposition of Eric Koenig) at 267-69 (Appendix at 76-78).

22.   Plaintiff Paula Koenig similarly testified that she did not have any knowledge about any conduct on the part of Abbott:

Q.   You have no personal knowledge, do you, of any representations Abbott may have made regarding OxyContin?

A.   No.

Q.   And you've never received any information of any kind from Abbott regarding OxyContin?

A.   No, I'm not aware of any.

Q.   And you're not aware of any alleged conspiracy between Abbott and anyone else?

A.   No.

Q.   Have you ever talked to your husband about Abbott?

A.   No.

Q.   So you can't testify as to anything that Abbott allegedly did wrong?

A.   No, I can't.

Q.     You do understand, do you not, that Abbott was sued in this lawsuit?

A.     I'm aware.

Q.     But you cannot say why Abbott was named in the lawsuit?

A.     No. I mean, I don't understand specifics or legalities.

*See* Exhibit F (transcript of October 11, 2005 deposition of Paula Koenig) at 139-40 (Appendix at 80-81).

## IV.     <u>Standard of Review</u>

Summary judgment is mandated where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party can defeat the summary judgment motion only by producing sufficient evidence to establish a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 322. Whether such an issue exists depends on whether a reasonable juror could find for the nonmoving party; that is, whether the non-movant's case, if proved at trial, would be sufficient to survive a motion for judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *see also DuPlantis v. Shell Offshore, Inc.*, 948 F.2d 187, 192 (5th Cir. 1991) ("the message implicit in both *Celotex* and *Anderson* . . . is that summary judgment is a legitimate and efficient way of disposing of unsupported claims").

When presented with a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Indeed, the nonmoving party's opposition may not rest on mere allegations or denials of

the moving party's pleading, but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Stults v. Conoco, Inc.*, 76 F.3d 651, 656 (5th Cir. 1996) ("[T]he nonmovant must come forward with evidence which would be sufficient to enable it to survive a motion for directed verdict at trial." (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 913 (5th Cir. 1996))).

In making this motion, Abbott is mindful that plaintiffs have the burden of proof. *Anderson*, 477 U.S. at 254 ("in making a ruling [on a motion for summary judgment], the judge must view the evidence presented through the prism of the substantive evidentiary burden" (internal quotation marks omitted)). In order to withstand defendant's motion for summary judgment, plaintiffs must establish a genuine issue of material fact as to *each* element of their claims. *Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir. 2003). As Abbott will now show, there is no genuine issue of material fact regarding plaintiffs' claims, and Abbott is therefore entitled to judgment as a matter of law.

## V.    Argument

Because Abbott did not call on plaintiff Eric Koenig's primary prescribing physician, Dr. Craig Danshaw, to promote OxyContin until nearly two years after he first prescribed OxyContin for Mr. Koenig, Abbott could not have influenced Dr. Danshaw's decision to prescribe OxyContin for plaintiff Eric Koenig. Thus, Abbott could not have caused the injuries plaintiffs allege. In other words, there is no factual nexus between plaintiffs and Abbott, and plaintiffs cannot show any causal link between their alleged injuries on the one hand, and Abbott on the other.

## A.    Causation Is a Necessary Element of a Personal Injury Claim

It is axiomatic that an injury-in-fact and a causal link between that injury and the defendant are essential elements of each of the causes of action asserted in this personal

injury case, regardless of the particular legal theory.  It is settled under Texas law that for each of plaintiffs' alleged causes of actions,[3] they must prove that some action by Abbott caused the alleged injury.

Absent proof of causation, Abbott is entitled to judgment as a matter of law. Because there is no nexus between plaintiff Eric Koenig's prescriptions for or use of OxyContin on the one hand, and Abbott's co-promotion of OxyContin on the other, all of plaintiffs' causes of action fail because plaintiffs cannot prove causation-in-fact and proximate cause.

**1.**      **Strict Liability based on Defective Design/Failure to Warn[4]** (Count I): *Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 775 (Tex. 1995) (granting defendant's motion for summary judgment for failure to establish causation); *Wyeth-Ayerst Labs Co. v. Medrano*, 28 S.W.3d 87, 95 (Tex. App.—Texarkana 2000, no pet.) (reversing judgment for plaintiff and rendering judgment for defendants, on the grounds that no causal connection was established).

**2.**      **Breach of Implied Warranty of Merchantability** (Count III)  *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 667 (Tex. 1999) ("liability for breach of warranty requires a showing of proximate cause") (citations omitted); *Stewart v. Transit Mix Concrete & Materials Co.*, 988 S.W.2d 252, 255 (Tex. App.—Texarkana 1998, pet. denied) ("[t]o recover for…breach of the implied warranties, [the plaintiff] must show that [defendant's] failure… was a proximate cause of [their] injuries").

---

[3] Counts two and five are asserted only against Mallinckrodt, and not against Abbott.
[4] Texas law does not recognize a cause of action for design defect or implied warranty of merchantability against prescription drug manufacturers.  *See Hackett v. G.D. Searle & Co.*, 246 F. Supp. 2d 591, 595 (W.D. Tex. 2002)   For purposes of this motion, Abbott assumes that plaintiff has alleged viable causes of action, each of which requires proof by plaintiff of causation.

3.   <u>Negligence</u> (Count IV): *Mosley v. Excel Corp.*, 109 F.3d 1006, 1009 (5th Cir. 1997) (product liability claims based on negligence require, *inter alia,* proof that defendant's actions were the proximate cause of injury); *General Motors Corp. v. Saenz*, 873 S.W.2d 353, 357 (Tex. 1993) (to recover for negligence, plaintiff must show that defendant's breach of duty was the proximate cause of her injuries).

4.   <u>Fraud, Misrepresentation, and Suppression</u> *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1996) (a fraud cause of action requires proof of a misrepresentation that when relied upon caused injury (citing *Sears, Roebuck & Co. v. Meadows*, 877 S.W.2d 281, 282 (Tex. 1994)); *Harco Energy, Inc. v. The Re-Entry People, Inc.*, 23 S.W.3d 389, 396 (Tex. App.—Amarillo 2000, no pet.) ("[w]ithout evidence that [plaintiff] relied on a misrepresentation…which reliance proximately caused damages…[plaintiff] cannot recover from [defendant for negligent misrepresentation]"); *Peltier Enters., Inc. v. Hilton*, 51 S.W.3d 616, 523 (Tex. App.—Tyler 2000, pet. denied) ("[f]raudulent concealment…requires proof of the same elements [as a fraud cause of action]").

Thus, causation is required for each of plaintiffs' personal injury claims, regardless of the particular legal theory asserted.

In Texas, the cause of action for loss of consortium (Count VIII) is a derivative cause of action. *Upjohn Co. v. Freeman*, 885 S.W.2d 538, 549 (Tex. App.—Dallas 1994, writ denied) (loss of consortium is derivative of the family member's claim for injury, and to recover under this claim, the spouse must prove that the defendant is liable for the personal injuries suffered by her spouse).  Recovery for loss of consortium is dependent upon proof of wrongful conduct that causes injury to another.  Plaintiff Paula Koenig's

claim for loss of consortium is therefore derivative of the underlying claims of plaintiff Eric Koenig, and the failure of the underlying claims precludes any recovery for loss of consortium. *Id.*

**B.     Plaintiffs' Claims are barred by the learned intermediary doctrine**

In addition to the indisputable break in the chain of causation established above, Dr. Danshaw's testimony also establishes, as an independent basis for summary judgment, that plaintiffs' claims are barred by the learned intermediary doctrine.

The learned intermediary doctrine states that when a "drug manufacturer properly warns a prescribing physician of the dangerous propensities of its product, the manufacturer is excused from warning each patient who receives the drug." *In re Norplant Contraceptive Prods. Liab. Litig.*, 955 F. Supp. 700, 703-04 (E.D. Tex. 1997), aff'd, 165 F.3d 374 (5th Cir. 1999) (citing *Alm v. Aluminum Co. of Am.*, 717 S.W.2d 588, 591-92 (Tex. 1986)). In essence, the doctor stands as a learned intermediary between the manufacturer and the consumer, and the doctor, once warned, exercises his or her independent medical judgment in deciding whether to prescribe the product for the consumer. *Rolen v. Burroughs Wellcome Co.*, 856 S.W.2d 607, 609-10 (Tex. App.—El Paso 1993, writ denied) ("The physician must use his comprehensive training and experience in conjunction with his knowledge of the individual patient in determining the suitability of a medication.").

When, as in the present case, all of plaintiffs' causes of action are tied to the alleged failure of a defendant to warn, proof that the physician was adequately warned of the alleged "dangers" mandates summary judgment as to all of plaintiff's claims. *In re Norplant*, 955 F. Supp. at 709-11. The defendants in *Norplant* were granted summary judgment when "all five of the prescribing physicians testified unequivocally that none of

the information shown to them [regarding the alleged undisclosed side effects] would have changed their minds about whether to prescribe" the product. *Id.* at 710-11. Regardless of the physician's knowledge, the physician's testimony that knowledge of the alleged undisclosed risk would not have changed his prescription decision requires the entry of summary judgment. *Id.* at 710-11; *Stewart v. Janssen Pharm., Inc.*, 780 S.W.2d 910, 912 (Tex. App.—El Paso 1989, writ denied). The learned intermediary doctrine and its application to plaintiffs' claims is briefed in full by the Purdue defendants in their Motion for Summary Judgment.

C.      **Because Plaintiffs Cannot Show that Abbott's Actions Caused their Injuries, Plaintiffs' Claims Fail as a Matter of Law**

Plaintiffs' claims all fail for the same basic reason – Abbott's actions could not have caused any of their alleged injuries. Abbott is not and has not been at any time a manufacturer, packager, distributor, supplier or seller of OxyContin. As set forth above, Abbott did not promote OxyContin to plaintiff Eric Koenig's primary prescribing physician, Dr. Danshaw, prior to his decision to prescribe OxyContin for Mr. Koenig. Therefore, his decision to prescribe OxyContin to plaintiff Eric Koenig could not have been based on Abbott conduct, and Abbott could not have caused the doctor to prescribe, or Mr. Koenig to take, OxyContin.

Courts have uniformly recognized that claims against Abbott for OxyContin-related injuries fail where there is no nexus between plaintiff and Abbott. Most recently, summary judgment was granted against two plaintiffs represented by the same law firm, after plaintiffs failed to respond to Abbott's motions for summary judgment. *Lee v. Purdue Pharma Co.*, No. 3:04-CV-1697-K (N.D. Tex. Oct. 24, 2005) (order granting summary judgment) (attached as Ex. G) (Appendix at 82); *Angulo v. Purdue Pharma*

*Co.*, No. 04-1638-A (W.D. La. Oct. 24, 2005) (ruling granting summary judgment) (attached as Ex. H) (Appendix at 83-84). The plaintiffs in the *Lee* and *Angulo* cases claimed that they had suffered damages as a result of ingesting OxyContin, and sought to hold Abbott responsible for their alleged damages. Both summary judgment motions were premised on and granted due to plaintiff's inability to demonstrate that any conduct on the part of Abbott caused their alleged injuries.

In the case of *Foister v. Purdue Pharma, L.P.*, 295 F. Supp. 2d 693 (E.D. Ky. 2003), the Court granted summary judgment on all issues, all claims and all plaintiffs, saying:

> Abbott was involved in the marketing of OxyContin. It argues that the plaintiffs cannot establish a causal link between their alleged injuries and Abbott's marketing. Abbott points out that it did not market OxyContin to any of the plaintiffs' physicians...Thus, Abbott clearly was not involved in the causal chain of the plaintiffs' alleged injuries and is entitled to summary judgment.

295 F. Supp. 2d at 709.

Lack of causation also resulted in summary judgment in favor of Abbott in *Yurcic v. Purdue Pharma, L.P.*, Civil Action No. 1: CV-03-175 (M.D. Pa. Mar. 29, 2004) (Memorandum and Order) (granting Abbott's summary judgment motion and recognized plaintiffs' failure to demonstrate a causal connection between Abbott and the injuries alleged) (Exhibit I) (Appendix at 99); in *Ewing v. Purdue Pharma, L.P.*, No. 2:02-CV-00150, 2003 WL 1883475, at *2 (W.D. Va. Apr. 10, 2003) (Opinion and Order) (granting summary judgment in Abbott's favor; the court found "no basis for liability against Abbott" where there was no connection between Abbott and plaintiff) (Exhibit J) (Appendix at 106); and in seven cases in the District of South Carolina where summary

judgment was granted where plaintiffs' physicians had not been called on by an Abbott

sales representative. *See Roberts v. Purdue Pharma*, L.P., No. 1:01-3110-2 (D. S.C. Dec.

4, 2003) (order granting summary judgment); *Blankenship v. P.F. Labs., Inc.*, No. 7-02-

3445-22 (D. S.C. Nov. 21, 2003) (order granting summary judgment); *Buzhardt v. P.F.*

*Labs., Inc.*, No. 8:02-3684-22 (D. S.C. Nov. 21, 2003) (order granting summary

judgment); *Cash v. P.F. Labs., Inc.*, No. 7:02-3685-22 (D. S.C. Nov. 21, 2003) (order

granting summary judgment); *Hammond v. P.F. Labs., Inc.*, No. 4-02-1748-22 (D. S.C.

Nov. 21, 2003) (order granting summary judgment); *Huck v. P.F. Labs., Inc.*, No. 4-02-

1747-22 (D. S.C. Nov. 21, 2003) (order granting summary judgment); *Roberts v. P.F.*

*Labs., Inc.*, No. 7:02-CV-1709-22 (D. S.C. Nov. 21, 2003) (order granting summary

judgment) (orders attached as Exhibit K) (Appendix at 108-14).

State courts have reached similar conclusions. *See, e.g., Banks v. Estate of*

*Patrick McLain, M.D.*, No. 02-CV-106(R), at 14-15 (Cir. Ct., Lauderdale County, Miss.

May 17, 2004) (Memorandum Opinion and Judgment granting summary judgment)

("[t]here simply [is] no evidence of a disputed issue of material fact regarding *any* causal

relationship between Abbott and the Plaintiff's injuries" (emphasis in original)) (Exhibit

L) (Appendix at 129); *see also Brown v. Purdue Pharma, L.P.*, No. 2002-0045CI (Cir.

Ct., Leflore County, Miss. Mar. 22, 2004) (order granting summary judgment) (granting

Abbott's motion for summary judgment based on lack of a causal connection between

Abbott and the plaintiff's alleged injuries where it was undisputed that no Abbott

employee detailed or had any contact with the plaintiff's prescribing physicians) (Exhibit

M) (Appendix at 131); *Allen v. Purdue Pharma, L.P.*, No. 01-C-224(R), at 2 (Cir. Ct.,

Greenbrier County, W. Va. June 26, 2002) (order granting summary judgment) (plaintiff

had "failed to present any evidence that links Abbott to any doctor that prescribed OxyContin to [plaintiff]," plaintiff had "failed to establish the necessary causal connection between Abbott's alleged wrongful conduct and the injuries allegedly suffered…") (Exhibit N) (Appendix at 134).

Because there is no possible causal link between plaintiffs and Abbott, Abbott is entitled to judgment based on plaintiffs' failure to make the necessary showing of causation with respect to the Abbott defendants. Accordingly, in the absence of the crucial element of causation, Abbott is entitled to judgment as a matter of law.

**D.      Because Plaintiffs' Injury Claims Fail for Lack of Causation, Plaintiffs' Derivative Civil Conspiracy Claim Also Fails**

Count VII of plaintiffs' complaint alleges that Purdue and Abbott engaged in a civil conspiracy[5] with regard to OxyContin. In Texas, the tort of civil conspiracy is a derivative tort, and therefore requires proof of an underlying specific intent tort. *Tilton v. Marshall*, 925 S.W.2d 672, 680-81 (Tex. 1996) ("[A] defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable." (citations omitted)); *Gonzales v. Am. Title Co. of Houston*, 104 S.W.3d 588, 594 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). Because plaintiffs are unable to prove any of the underlying tort causes of action, their civil conspiracy allegations fail as a matter of law. Accordingly, Abbott is entitled to summary judgment on this Count.

---

[5] The tort of civil conspiracy requires proof of a specific intent to agree "to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Juhl v. Airinton*, 936 S.W.2d 640, 644 (Tex. 1996). "Because a conspiracy requires [specific] intent, parties cannot conspire to be negligent." *Firestone Steel Prods. Co. v. Barauas*, 927 S.W.2d 608, 617 (Tex. 1996).

**E.   Plaintiffs' assertion that Abbott and Purdue were engaged in a joint venture is without factual or legal basis**

Plaintiffs also assert that Abbott and Purdue were "joint venturers," creating joint liability.  While plaintiffs have the burden of proof on this issue, this theory has already been advanced elsewhere by the same plaintiffs' counsel and thus Abbott addresses this issue in full.

The Abbott-Purdue agreement is set forth in a comprehensive, written contract called the Co-Promotion Agreement.  A copy is submitted under seal as Exhibit B to this Motion for Summary Judgment.  The Co-Promotion Agreement explicitly states that the parties are independent contractors and not joint venturers.  Exhibit B, Art. 7 (Appendix at 31).  The Co-Promotion Agreement states that it is governed by Connecticut law (*id.* at Art. 15.8 (Appendix at 48)), and under Connecticut law a joint venture only arises "where two or more persons [] combine their property, money, effects, skill, and knowledge to seek a profit jointly in a single business enterprise without any actual partnership or corporate designation."  *Electronic Assocs. v. Automatic Equip. Dev. Corp.*, 185 Conn. 31, 35, 440 A.2d 249, 251 (1981).  "The relationship between contracting parties cannot amount to a joint venture unless the parties so intend."  *Id.*  The essential elements of a joint venture are "'(1) a community of interest in the performance of the common purpose, (2) joint control or right of control, (3) a joint proprietary interest in the subject matter, (4) a right to share in the profits and (5) a duty to share in any losses which may be sustained.'"  *Mahoney v. Sylvester*, 1993 WL 426082, at *2 (Conn. Super. 1993) (citations omitted).  The sharing of profits and losses is the benchmark of the existence of a joint venture. *See, e.g., Piccolo v. Weimann*, 7 Conn. App. 646, 509 A.2d 1094 (1986).

Abbott anticipates that plaintiffs will assert that Texas law governs in determining whether a joint venture exists.  Under Texas law, a joint venture must be based on either an express or implied agreement.  C*oastal Plains Dev. Corp. v. Micrea, Inc.*, 572 S.W.2d 285, 287 (Tex. 1978).  A joint venture is formed when the following elements are established:  (1) mutual right of control or management; (2) community of interest, (3) an agreement to share profits; and (4) an agreement to share losses, costs, or expenses.  *See Castle Tex. Production Lim. P'ship v. Long Trusts*, 134 S.W.3d 267, 278 (Tex. App.— Tyler 2003) (citing *Ayco Dev. Corp. v. G.E.T. Service Co.*, 616 S.W.2d 184, 186 (Tex. 1981)).  A joint venture is <u>not</u> established if any one of the four elements is <u>not</u> present, *Swinehart v. Stubbeman, McRae, Sealy, Laughlin & Browder, Inc.*, 48 S.W.3d 865, 879 (Tex. App.—Houston [14th Dist.] 2001, pet denied) (citations omitted), and whether a joint venture exists is a question of law for the court's determination.  *Id.*  Sharing in profits and losses is an essential element of a joint venture, *Coastal Plains*, 572 S.W.2d at 287, and no joint venture can exist as a matter of law when there is no agreement to share losses.  *Gutierrez v. Yancey*, 650 S.W.2d 169, 171 (Tex. App.—San Antonio 1983, no writ).

Here, plaintiff cannot show the following required elements of a joint venture:

**1.      There was no agreement, express or implied, to form a joint venture**

There is only one agreement.  It is the clear and comprehensive written agreement to co-promote OxyContin.  That Co-Promotion Agreement does not contain <u>any</u> language demonstrating an intent to form a joint venture; on the contrary, it explicitly states that Purdue and Abbott are <u>not</u> joint venturers.  The Court may dispose of plaintiffs' joint venture argument on this basis alone.  *See BA Mortgage and Int'l Realty Corp. v.*

*American Nat'l Bank & Trust Co. of Chicago*, 706 F. Supp. 1364, 1372 (N.D. Ill. 1989) (where contract expressly stated that joint venture did not exist, court was willing to accept "freely-negotiating parties at their word"); *see also Stone v. First Wyoming Bank, N.A.*, 625 F.2d 332, 340 (10th Cir. 1980) (recognizing that "joint venture is a contractual relationship," that "the intent of the parties is controlling," and that where there is an "express agreement" between the parties, that intent is to be gleaned from the express agreement).

There is no other agreement between Purdue and Abbott, whether express or implied.  Plaintiffs certainly do not and cannot point to any other such agreement.  They have therefore failed to carry "[t]he heavy and difficult burden to establish the joint venture absent an express agreement . . . ."  *Slaihem v. Sea Tow Bahamas Ltd.*, 148 F. Supp. 2d 1343, 1348 (S.D. Fla. 2001).

## 2. **Abbott did not have a mutual right of control or management**

Abbott's direction of OxyContin-related activities was limited to the activities of its own sales representatives.  Attached hereto as Exhibit O (Appendix at 136-41) is the Affidavit of Michael Friedman, President and Chief Executive Officer of Purdue Frederick Company and Purdue Pharma L.P. ("Purdue").  In his Affidavit, Mr. Friedman addresses Abbott's role regarding OxyContin and Purdue's relationship with Abbott as follows:

- Abbott was appointed only to co-promote OxyContin to specific categories of physicians, and not to undertake any other activities. Ex. O at ¶ 6 (Appendix at 137).

- Abbott supervised its sales representatives; Purdue did not supervise them. *Id.* at ¶ 9 (Appendix at 137).

- Abbott did not own or have any property interest in OxyContin. *Id.* at ¶ 11 (Appendix at 138).

- Abbott did not control or manage the sale or distribution of OxyContin, and did not share managerial control. *Id.* at ¶¶ 11, 12 (Appendix at 138). Purdue did not make overall decisions jointly with Abbott. *Id.*

- Abbott was paid commissions, and Abbott's commissions were not linked to profits. *Id.* at ¶¶ 13, 16, 21-22 (Appendix at 138-39).

- Purdue did not intend to create a partnership or joint venture with Abbott, and did not do so. *Id.* at ¶¶ 18, 19 (Appendix at 139).

- Abbott and Purdue were independent contractors. *Id.* at ¶ 17 (Appendix at 139).

Abbott had no managerial role, no control over Purdue's actions, and no veto over Purdue's marketing plans. While Abbott could only use promotional materials that had been approved by Purdue,[6] Abbott had no control with respect to Purdue's use of promotional materials.

Similarly, Abbott had no role of any kind in the development, manufacture, distribution or sale of OxyContin. It similarly was not involved in any way in obtaining FDA approval of OxyContin, in preparing the package insert for OxyContin, or in determining the milligram strengths (*i.e.*, dosage size) of OxyContin. *Id.* at ¶¶ 24-27 (Appendix at 140).

### 3. The Co-Promotion Agreement served an explicitly limited common purpose – to co-promote OxyContin – and nothing more

It is a somewhat obvious, but nonetheless important, point: The Co-Promotion Agreement constituted nothing more that an agreement between Purdue and Abbott that

---

[6] Purdue, as the holder of the NDA, had the obligation to submit promotional materials to the FDA, to communicate with the FDA about them, and to assure that all promotional materials complied with FDA rules and regulations. Abbott had no role with respect to the FDA in this or any other regard; see Ex. O at ¶ 25 (Appendix at 140).

Abbott would assist in Purdue's efforts to promote its product. The Co-Promotion Agreement did not touch on any of the other essential aspects of creating and selling a pharmaceutical product – like patenting the product, designing it, manufacturing it, preparing its labeling, seeking FDA approval of the product and label, pricing the product and selling it. To conclude that Abbott was a joint venturer with Purdue when Abbott had no involvement whatsoever in nearly every step of the process of selling OxyContin – including the actual sale of the product – would expose every advertising agency, public relations firm and celebrity endorser or spokesperson retained solely to assist with the promotion of a product or service to joint venture liability.

As the court noted in *US Airways Group v. British Airways PLC*:

> Many companies seek to cooperate with each other and reach agreements to implement such cooperation. However, most of these agreements do not create joint ventures. A joint venture represents more than a simple contractual relationship.

989 F. Supp. 482, 493 (S.D.N.Y. 1997) (internal quotation marks and citations omitted).

Moreover, with respect to the co-promotion of OxyContin in particular, Purdue and Abbott each acted independently. Each company acted through its own sales force, which it independently trained, supervised and compensated. The Co-Promotion Agreement itself explicitly so required.

Joint venture liability has serious consequences, most notably the consequence of making one entity jointly liable for the alleged misconduct of another, even if that entity had no actual involvement in the alleged misconduct. Given these serious consequences, the law requires far more than a limited role, and requires more than an "accidental" creation of a joint venture in order to create joint venture liability. *See, e.g.*, *Sleeping Indian Ranch, Inc. v. West Ridge Group, LLC*, 119 P.3d 1062, 1069 (Colo. 2005) ("A

joint adventure cannot arise by mere operation of law, its legal force being derived from voluntary agreement of the parties either express or implied." (internal quotation marks and citations omitted)); *Lackman v. Rousselle,* 596 N.W.2d 15, 23 (Neb. 1999) ("A joint venture can exist only by voluntary agreement of the parties and cannot arise by operation of law."); *George v. Capital South Mortgage Investments, Inc.*, 961 P.2d 32, 47 (Kan. 1998) ("The intent to form such a relationship must exist; a joint venture cannot arise by operation of law.").

   **4.     There is no sharing of profits as principals or sharing of losses, costs, or expenses**

   The co-promotion of OxyContin itself generated no revenues.  The revenues came from OxyContin sales, and only Purdue sold OxyContin.  Abbott had no role in the sale of OxyContin, it derived no revenue therefrom, and had no right to participate in any profits from the sale of OxyContin.  *See California Dental Ass'n v. FTC*, 526 U.S. 756, 767 n.6 (1999) (quoting with approval a "generally accepted definition" of "profit" meaning "gain from business or investment over and above expenditures, or gain made on business or investment where both receipts or payments are taken into account . . . ." (internal quotation marks and citations omitted)).  Abbott's compensation was based solely on commissions, and Abbott was entitled to receive commissions regardless of Purdue's profits.  If Purdue lost money, Abbott would not have shared in those losses.

   Plaintiffs' counsel has already had the opportunity to explore Purdue and Abbott's relationship in detail, and has failed to discover any evidence of a joint venture.  On September 27, 2005, plaintiffs' counsel deposed Purdue on the Abbott-Purdue relationship, pursuant to Rule 30(b)(6).  Although the deposition was noticed in a case pending in Iowa, by agreement the testimony of the Purdue designee, Sally Riddle, may

be used in other OxyContin cases like this one where the plaintiffs are represented by the same counsel.  Ms. Riddle testified that she was the chief Purdue contact with Abbott. Her testimony included these salient points:

- Abbott and Purdue did not co-manage; each handled its own promotional activities and simply kept the other informed.  Ex. P at 35 (Appendix at 145); *see also id.* at 24, 31 (Appendix at 143-44). There was little actual coordination between the two companies. *Id.* at 33 (Appendix at 145).  Each company had its own separate marketing plan.  *Id.* at 132 (Appendix at 156).

- Abbott was simply an additional sales force for Purdue.  *Id.* at 59 (Appendix at 146)

- Abbott's activities were limited to detail calls on physicians in the specialties listed on the Co-Promotion Agreement.  *Id.* at 60 (Appendix at 146).

- Abbott did not share profits.  *Id.* at 62, 64-65 (Appendix at 147-48).  Abbott was paid commissions based on the volume of prescriptions it generated.  *Id.* at 62 (Appendix at 147).

- Abbott was not paid based on income received by Purdue.  *Id.* at 64-65 (Appendix at 147-48).

- Commissions were paid on "net sales;" "net sales" were gross sales less rebates and similar items which affected the value or what was sold.   Neither manufacturing costs nor operating costs were deducted to reach "net sales" and thus the payment of commissions cannot be labeled a payment of "profits."  *Id.* at 72-73 (Appendix at 149-50).

- Ms. Riddle did not use the term "partner" or "partnership" to refer to the Abbott relationship, *id.* at 58 (Appendix at 146), and if others did, she assumed it was meant in a collegial sense, *id.* at 59, 100 (Appendix at 146, 151).  She did not consider the relationship to be a legal "partnership."  *Id.* at 101, 123-24, 125-26 (Appendix at 152, 154-55).

- Abbott and Purdue did not have a joint corporate launch meeting. *Id.* at 128  (Appendix at 155).

- Abbott and Purdue did not have a joint national sales meeting.  *Id.* at 120 (Appendix at 153).

Nothing said in this deposition testimony provides any support for plaintiffs' theory that Purdue and Abbott formed a joint venture.

Mere references in internal documents to Abbott "partnering" with Purdue and similar comments do not create a legal partnership; a partnership cannot be formed by simply by referring to a business relationship as a "partnership." *See A.T. Kearney, Inc. v. IBM Corp.*, 73 F.3d 238, 242 (9th Cir. 1995) ("Though IBM frequently declared itself FM's and Kearney's 'partner,' it clearly was not involved in a true partnership agreement with either party."); *US Airways*, 989 F. Supp. at 493 (allegations of "internal documents describ[ing] the BA-USAir alliance as a 'joint venture' or 'partnership'" were insufficient to "plead an intent to be joint venturers").

The case of *Binkley v. Palmer*, 10 S.W.3d 166 (Mo. Ct. App. 1999), is directly on point. In this case, plaintiff claimed a joint venture or partnership, and the criteria for formation of a joint venture or partnership under Missouri law are virtually identical to those required by Texas law.[7] In *Binkley*, a limited partnership formed to develop a golf resort and the operating company intended to operate the golf resort contracted with certain Arnold Palmer companies (the companies of the well known golfing figure) to design and build two golf courses. Just like the Co-Promotion Agreement in this case, the written contracts in *Binkley* expressly stated that no partnership or joint venture was formed. *Id.* at 168. The parties created a joint logo, featuring the Arnold Palmer umbrella logo. *Id.* Purdue and Abbott similarly used a co promotion logo.

---

[7] Under Missouri law, the elements of a joint venture are "(1) an express or implied agreement among members; (2) a common purpose to be carried out by the members of the group, (3) a community of pecuniary interest in the common purpose, and (4) an equal voice, giving an equal right of control in the direction of the enterprise." *Id.*

Plaintiffs argued in *Binkley*, just as plaintiff does here, that nevertheless a joint venture had been formed. The trial court disagreed, finding no triable issue and granting summary judgment. *Id.* The appellate court affirmed, stating that:

- The use of Palmer's "image and involvement," together with a videotape depicting Palmer's endorsement and used in promotion, did not create a joint venture. *Id.* at 170.

- Palmer's role was limited to "designing, managing and promoting the golf course and its accompanying facilities," as opposed to the entire resort. *Id.*

- The Palmer companies provided services, "for which they were reimbursed." *Id.*

- Such a role "does not as a matter of law constitute co-ownership of the North Port business enterprise, nor does it support the existence of a joint venture between Respondents [the Palmer companies] and Promoters [i.e., plaintiffs]." *Id.*

- There was no intent to form a partnership or joint venture, and the documents "reveal[] clear disclaimers of any such relationship between the parties." *Id.* at 171.

- The payments made to the Palmer companies, like the payments to Abbott in this case, were not payments of "profits." Payment to Palmer of 6% of club-related gross revenues, plus 3% of gross income, was not a sharing of profits. *Id.* at 172. Profits are "the benefit of or the advantage remaining after all costs, charges and expenses have been deducted from income." *Id.* (emphasis added). "Gross revenues are not profits, and an agreement to pay a percentage of gross revenues is not the sharing of profits." *Id.*

*Binkley* addresses and rejects virtually the same arguments that plaintiffs advance here, and it demonstrates that plaintiffs have advanced no triable issue of fact with respect to the existence of a joint venture. This Court should similarly conclude that, as a matter of law, no joint venture existed here.

**F.**   **Because Plaintiffs Do Not Have Standing to Sue Abbott, Abbott Is Entitled to Summary Judgment as a Matter of Law**

There must be a "case or controversy" between plaintiff and defendant in order for the plaintiff to proceed with a lawsuit.  *O'Shea v. Littleton,* 414 U.S. 488, 493-95 (1974).  This standing requirement "is an essential and unchanging part of the case-or-controversy requirement of Article III."  *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1984); *see also Bertulli v. Int'l Ass'n of Continental Pilots,* 242 F.3d 290, 294 (5th Cir. 2001) ("[s]tanding . . . goes to the constitutional power of a federal court to entertain an action").

The burden is on the party who invokes the court's authority "to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, and that the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision."  *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 472 (1982) (internal quotations omitted); *see also Shea v. Brister,* 26 F. Supp. 2d 943, 945 (S.D. Tex. 1998)  ("Article III of the United States Constitution authorizes the federal courts to decide only actual cases and controversies. To satisfy the standing requirement, a litigant must demonstrate: (1) that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant; (2) that the injury "fairly can be traceable to the challenged action"; and (3) that the injury "is likely to be redressed by a favorable decision" (internal citations omitted).  "Failure to establish any one [of these three elements] deprives the federal courts of jurisdiction to hear the suit."  *Ford v. Nylcare Health Plans of the Gulf Coast, Inc.,* 301 F.3d 329, 332 (5th Cir. 2002) (citing *Rivera v. Wyeth-Ayerst Labs.,* 282 F.3d 315, 319 (5th Cir. 2002)).

Here, plaintiffs have provided no facts to show that their alleged injuries can be fairly traced to any action by Abbott.   Therefore, this Court should conclude that plaintiffs do not have standing to sue Abbott.

## VI.   <u>Conclusion</u>

Plaintiffs' claims cannot be sustained against Abbott.   Abbott's limited role was to promote OxyContin to specific categories of doctors, and Abbott did not influence plaintiff Eric Koenig's prescribing physicians' decisions to prescribe OxyContin for Mr. Koenig.   Thus, there is no causal link between Abbott and plaintiffs, and the required nexus between Abbott and any conceivable injuries that plaintiffs allegedly suffered cannot be proved.   Plaintiffs' unsupported assertion that Abbott and Purdue engaged in a "joint venture" is contrary to both the facts and the law, and does not provide a basis for establishing the requisite proof of causation.   As a result, plaintiffs lack standing and cannot present a justifiable controversy.

For the reasons set forth above, Abbott Laboratories and Abbott Laboratories, Inc., respectfully request that this Court grant them summary judgment on all claims asserted against them in this case.

Respectfully submitted,


By:s/ Stephen E. Scheve
      Stephen E. Scheve
      Attorney-in-Charge
      Texas Bar No. 00794928
      Federal I.D. No. 18784
      Alfredo A. Barrera
      Texas Bar No. 24040475
      Federal I.D. No. 590034
      Baker Botts L.L.P.
      One Shell Plaza
      910 Louisiana Street
      Houston, Texas  77002-4995
      (713) 229-1234
      (713) 229-1522 (fax)

Of Counsel:
Paul F. Strain, Esq.
M. King Hill, Esq.
VENABLE LLP
1800 Mercantile Bank & Trust Building
2 Hopkins Plaza
Baltimore, Maryland  21201-2978
Telephone:    (410) 244-7400
Facsimile:    (410) 244-7742

Attorneys for Abbott Laboratories and
Abbott Laboratories, Inc.

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument will be provided to all counsel of record via electronic service by the court or by regular mail and/or certified mail, return receipt requested as indicated below, on November 14, 2005, as follows:

John A. Bruegger *(via electronic service by court)*     Counsel for Plaintiff
Steven D. Davis
Tor A. Hoerman
Gary L. Payne
Jo Anna Pollock
SimmonsCooper, LLC
707 Berkshire Blvd.
E. Alton, IL 62024

W. Mark Lanier (CM-RRR)     Counsel for Plaintiff
The Lanier Law Firm, P.C.
6810 FM 1960 West
Houston, Texas 77068

Michelle Heron Galindo (CM-RRR)     Counsel for Plaintiff
Hoffman Law Firm
4514 Cole Ave
Suite 806
Dallas, Texas 75205

Mr. Knox D. Nunnally *(via electronic service by court)*     Counsel for Purdue
Mr. Scott Stathan
Mr. Jared I. Levinthal
Vinson & Elkins L.L.P.
2300 First City Tower
1001 Fannin Street
Houston, Texas 77002-6760

s/ Stephen E. Scheve
Stephen E. Scheve